# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 17, 2014 Session

## STATE OF TENNESSEE v. THOMAS FANCHER GREENWOOD

**Appeal from the Circuit Court for Coffee County**
**No. 37,894F      L. Craig Johnson, Judge**

---

**No. M2013-01924-CCA-R3-CD - Filed November 21, 2014**

---

Appellant, Thomas Fancher Greenwood, was found guilty of felony murder during the perpetration of aggravated child neglect, reckless homicide as a lesser-included offense of felony murder during the perpetration of aggravated child abuse, aggravated child abuse, and aggravated child neglect. The trial court merged the reckless homicide conviction with the felony murder conviction and sentenced appellant to life in prison for felony murder and two twenty-year concurrent sentences for aggravated child abuse and aggravated child neglect, resulting in an effective sentence of life in prison. He now appeals his judgments and convictions on the following grounds: (1) whether the evidence was sufficient to support the convictions; (2) whether the trial court erred by overruling appellant's motion to suppress all information contained in his cellular telephone, which was seized by law enforcement officers; (3) whether the trial court erred in allowing hospital and autopsy photographs of the victim to be admitted into evidence; (4) whether the trial court erred in permitting Dr. Seyler to testify with regard to the cause of the victim's injuries; (5) whether the trial court erred by allowing Dr. Seyler to view the video recording of the victim and render an expert opinion based thereon; (6) whether the trial court erred by allowing Detective Stone to testify that marks on the victim's neck resembled fingerprints; (7) whether the trial court erred by permitting Amy Vickers to testify with regard to statements made by R.K.; and (8) whether the trial court erred in sentencing appellant. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., and LARRY J. WALLACE, SP. J., joined.

Roger J. Bean (at trial and on appeal) and Bradley Eldridge-Smith (on appeal), Tullahoma, Tennessee, for the appellant, Thomas Fancher Greenwood.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Charles Michael Layne, District Attorney General; and Marla R. Holloway and Jason Michael Ponder, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

I. Procedural History

In a four-count indictment, appellant was charged with felony murder during the perpetration of aggravated child abuse, felony murder during the perpetration of aggravated child neglect, aggravated child abuse, and aggravated child neglect for the March 9, 2010 events culminating in the death of the victim, the two-year-old child of appellant's then-girlfriend, R.K.[1] Following a jury trial, appellant was found guilty of reckless homicide as a lesser-included offense of felony murder during the perpetration of aggravated child abuse, felony murder during the perpetration of aggravated child neglect, aggravated child abuse, and aggravated child neglect. The jury imposed a sentence of life in prison for the felony murder conviction. After a sentencing hearing on the remaining convictions, the court imposed two twenty-year sentences for aggravated child abuse and aggravated child neglect, resulting in an effective sentence of life in prison.

II. Facts

A. Trial

The State called the victim's mother, R.K., as its first witness. R.K. testified that at the time of the trial, she resided with her parents in Coffee County so that she could attend college. In March 2010, she lived on Circle Drive in Tullahoma. She explained that the victim was born two months premature and that he was hospitalized for almost a month before being released. When the victim was three months old, he became sick, and R.K. took him to the hospital. He required breathing treatments every time he was sick because the congestion would be severe. The victim also had asthma.

R.K. elaborated that when the victim was a baby, his asthma would intensify if he had a cold with congestion. She had to administer breathing treatments to diminish the congestion and clear his lungs. As the victim grew older, he became ill less frequently and, accordingly, experienced fewer asthma attacks. R.K. explained that the victim was sick

---

[1] It is the policy of this court to refer to the minor victims of crime, as well as their immediate family members, by their initials.

mostly during the winter months. He did not experience asthma attacks when running, like many children did; rather, his attacks were brought on by illness and congestion in his lungs.

R.K. stated that between Christmas 2009 and March 9, 2010, the victim's breathing was "really good," and he had not experienced any asthma attacks. She further explained that the improvement in the victim's asthma coincided with her moving from an apartment into the Circle Drive residence because the apartment below her had been infested with mold. She said that when she moved from her former residence, the victim's asthma "all of a sudden stopped."

R.K. recalled that the victim was "always playing, running around" outside. He played ball with R.K.'s nieces and nephews. His activity was never limited by his asthma.

R.K. testified that she met appellant in high school. He played baseball, and she was on the softball team. She graduated from Tullahoma High School in 2005. After graduating, she had no further contact with appellant until they met again during a chance encounter approximately one month before the victim's death. R.K. said that she trusted appellant and had no reason not to do so. Appellant began staying with R.K. approximately nine days before the victim's death. His stay was temporary in nature because he was waiting to rent a house with a friend and the process was going to take around two weeks.

R.K. related that appellant had epilepsy. She witnessed a "little" seizure before he moved into her house. She described that he was lying on the sofa, and he "twitched" and his telephone fell from his hand. The episode was over in two to three seconds, and appellant displayed no lasting effects. When appellant moved into R.K.'s house, he brought his anti-seizure medication with him and took it each morning.

R.K. stated that on March 9, 2010, her sister Jennifer was involved in a custody hearing, and R.K. had been subpoenaed to testify. Appellant said that he would "be happy to" watch the victim. R.K. was scheduled to be the first witness and thought her testimony would move quickly. The victim typically went to bed around 10:00 to 10:30 each night and awoke at 10:00 to 10:30 each morning, so R.K. expected appellant to have to watch the victim for about thirty "waking" minutes. Before R.K. left for the courthouse that day, she checked the victim's breathing out of habit and left her house around 7:30 a.m. She and her family arrived at the courthouse at 8:30 a.m.

During the 10:00 hour, R.K. walked to her car and retrieved her telephone. She texted appellant to check on the victim, and appellant reported that he was fine. R.K. learned that the witness order had been changed and that she would be the last witness called. Shortly thereafter, appellant sent R.K. a text reporting that the victim had bitten him. R.K. tried

-3-

repeatedly to call appellant, but he did not answer his telephone. Finally, after R.K. admonished him via text message to answer his telephone because he was caring for her child, he returned the call. Appellant then reported that the victim had ingested some children's Motrin. R.K. instructed him to watch the victim and to call 9-1-1 if he began acting strangely. Appellant subsequently told R.K. that he had suffered a seizure while holding the victim and that he had dropped him, bumping the victim's head in the process. She again instructed appellant to call 9-1-1 if the victim exhibited unusual behavior. She asked appellant if the victim was stumbling, and he responded that the victim was fine and was playing in his room.

Meanwhile, the court adjourned for lunch. R.K. testified that when they returned to court, she called appellant to speak with the victim, but appellant advised that the victim was sleeping. R.K. was initially worried about the victim's sleeping after suffering a bump on the head, but she reasoned that a couple of hours had passed and relaxed. Appellant said they had been playing outside. R.K. instructed appellant to check the victim's breathing and not to let him sleep for too long.

R.K. recounted that she was on the witness stand when appellant tried to call her again. She called back when she was finished, and appellant explained that the victim had experienced an asthma attack and was in an ambulance. Appellant handed the telephone to a paramedic, who advised that they were proceeding to the hospital because the victim had suffered an asthma attack.

R.K. arrived at the emergency room, and appellant met her as she was walking in. He stated, "'I hope they do not get me for child neglect.'" She had to wait before being escorted into a small room in the treatment area, where she was informed that the victim presented with multiple bruises. She turned to appellant and began yelling at him and asking what he had done to the victim. She heard someone say that the victim had passed away, and she "lost it." Emergency room personnel took her to see the victim. At trial, she reviewed pictures and confirmed that when she left home that morning, the victim had none of the injuries depicted therein except for a small pink mark on his head where he had bumped it and the scab had already come off.

On cross-examination, R.K. stated that the victim was always excited to see appellant and that she had told an officer that she had never seen appellant harm the victim. She acknowledged that at 1:02 p.m., appellant sent her a text when she was in court stating that the victim was "grinding his teeth, making his mouth bleed," but she never received the text; she learned of the text at a later time. She also did not receive the 1:46 p.m. text stating that the victim was "just dead to the world." Appellant recorded a video of the victim at 12:17 p.m. that clearly showed the victim was in distress, but he had no marks on him at that time.

-4-

R.K. was later shown the video by a detective; she did not receive it from appellant. R.K. confirmed that she had taken the victim to the doctor seventeen times in 2008, twelve times in 2009, and six times after moving from her apartment into her house.

On re-direct examination, R.K. reviewed her cellular telephone records and explained that she attempted to call appellant fifty-nine seconds before he sent the "dead to the world" text and that he called her ten seconds after he sent it. They had a conversation of more than five minutes in length, but appellant never mentioned the victim's being in distress or having any injuries.

The State's next witness was John Talley, a dispatcher for the Coffee County 9-1-1 service. Through him, a recording of the 9-1-1 call was entered.

Derrick Watson, a Coffee County Emergency Medical Services ("EMS") paramedic, testified next. He responded to the 9-1-1 call at Circle Drive. Appellant met him at the door holding the victim, whom Mr. Watson described as "limp, pulseless, and apneic, which means not breathing." Mr. Watson asked appellant about any medical issues, and appellant advised that the victim had asthma. Mr. Watson carried the victim to the ambulance and removed his clothing to assess his injuries. His partner, Patrick Robinson, began CPR and ventilating the victim with 100% oxygen. The fire department then arrrived, and personnel entered the ambulance and took over two-finger CPR while Mr. Watson retrieved the "advanced airway kit" and prepared to intubate the victim. Mr. Watson secured the victim's airway and connected him to a cardiac monitor, which showed no signs of life. The victim had no blood pressure, no pulse, and no respirations. Mr. Watson inserted an intraosseous needle into the bone of the victim's leg to administer fluids and epinephrine to no avail. They transported the victim to the hospital while continuing resuscitative efforts. Upon arrival, they placed the victim in a hospital bed.

Mr. Watson described the injuries he observed on the victim's body as follows: bruising around the neck; bruising or a contusion above an eye; bruising in the abdominal area; and bruising along the spinal column. He confirmed that during the life-saving efforts, nothing was inserted into the victim's nose. He noted blood in the victim's airway when he intubated the victim. He clarified, "The call came out as an asthma attack, but it was cardiac arrest." Police arrived at the scene shortly after EMS. Mr. Robinson had called them because he "suspected some type of abuse." Mr. Watson said that "typically," he would not tell a parent over the telephone that their child was in cardiac arrest and that he had never done so.

On cross-examination, Mr. Watson admitted that he had not been informed that the 9-1-1 operator had instructed appellant to reach into the victim's mouth and attempt to remove phlegm. He acknowledged that he observed blood-tinged phlegm in the airway.

On re-direct examination, Mr. Watson denied that any of the resuscitative efforts caused injury to the victim. He was "100% positive" about that fact. He further explained that when he first began treating the victim, his core was warm, but his extremities "were cool to the touch."

Mr. Watson explained, on recross-examination, that he heard "breath sounds over the appropriate lung fields" while Mr. Robinson was ventilating the victim but that the victim never breathed on his own.

The State called Officer Matthew Walker with the Tullahoma Police Department as its next witness. He testified that as a matter of protocol, he responded to a "call of CPR in progress" for a child having difficulty breathing. When he arrived, appellant told him that he had suffered a seizure and dropped the victim, causing the victim to strike his head on a bed rail. According to appellant, "a few moments later," the victim had trouble breathing so he "hooked" him to an asthma machine. The treatment was not successful, so appellant dialed 9-1-1. The operator instructed him to perform CPR. Officer Walker said that appellant was "very calm."

After the ambulance left, Officer Walker drove to the hospital and was told that the victim had passed away. Appellant traveled to the hospital with a family member. When Officer Walker saw appellant outside the hospital, he asked appellant to come inside so someone could speak with him. Officer Walker also saw the victim with "multiple marks all about his body." He then notified investigators.

The State's next witness was Amy Vickers, a registered nurse at Harton Regional Medical Center's emergency room. She was the "recorder" for the victim's case, which meant that she made entries and signed the records. She was present when the EMS call came in and when the ambulance arrived at 3:06 p.m. She observed that the victim had multiple bruises and was unresponsive. The victim's treatment team consisted of Ms. Vickers, three other nurses, Dr. Clifford Seyler, and another doctor. The victim presented with no signs of responding to emergency treatments. Dr. Seyler pronounced the victim dead at 3:17 p.m. The victim's mother arrived and was escorted to a small private room in the treatment area. Ms. Vickers and Dr. Haley entered the room and delivered the news to R.K. R.K. began screaming, "'What did you do to my baby?'" Appellant did not answer. R.K. continued screaming and crying, "'Why did you hurt my baby?'" Dr. Haley asked what had happened. Appellant said that the victim had ingested children's Motrin in an unknown

amount and that he texted R.K., who instructed him to watch the victim carefully. He reported that they went outside to play and that when they came back inside, he was carrying the victim when he experienced a grand mal seizure, which caused him to drop the victim and fall on top of him. Appellant stated that when he awakened, he took his anti-seizure medication, Depakote. He reported that the victim was crying, which brought about an asthma attack. He utilized the nebulizer, and the victim coughed up phlegm then gasped for air. Appellant then called 9-1-1 and was instructed to stick his finger in the victim's mouth to remove the phlegm. He stated that he then began CPR.

Ms. Vickers described appellant's demeanor as he relayed the events as "flat and nonemotional, no change in his voice, just very matter of fact." She said that his affect continued in this manner even when R.K. was screaming. She recalled appellant's saying to R.K., "'I'm sorry. I didn't do nothing [sic] wrong.'" R.K. was sobbing and fell from her chair to the floor, crying, "'My baby, my baby.'"

R.K. wished to see the victim, so Dr. Haley left the room to check on the victim's status. Ms. Vickers testified that she sat on the floor with R.K. and that R.K. rested her head on Ms. Vickers's shoulder and continued to cry until Dr. Haley returned. They all then walked down the hall to view the victim. As they neared the room, R.K. said that she did not want appellant to be there. When they entered the treatment room, R.K. began screaming and saying that she wanted to die. She cried, "'What happened to my baby? Please bring my baby back. What happened to him? Where did all these bruises come from?'" Dr. Seyler asked R.K. if she had any information about the bruises on the victim. She responded that he did not have any previously except for a small pink mark on his face from a scratch that was healing. R.K. touched the victim's face and told him she loved him. At trial, Ms. Vickers identified photographs of the victim depicting the various injuries on his body, including scratches about his face, bruising around his right eye, an abrasion on his chin, abrasions and scratches on the back of his neck, and bruising around his neck.

The State's next witness was Investigator Tyrone Brazier, a detective with the Tullahoma Police Department. He and his partner, Investigator Dale Stone, were en route to Harton Hospital on March 9, 2010, on an unrelated matter when they received a call to investigate an incident there involving an injured child. When they arrived, Officer Walker briefed them on the circumstances of the case. Detective Brazier walked into the emergency room waiting area and saw appellant, whom he knew. He told appellant why they were present and asked him to accompany them outside to talk. Appellant said that "'things weren't looking too good for him right then.'"

Appellant accompanied them to the police department, where Detective Stone conducted an interview with appellant, and Detective Brazier participated from time to time.

Detective Brazier later visited R.K.'s Circle Drive residence where he videotaped and photographed areas of the house, including pills scattered on the floor and the nebulizer, and collected evidence, including Blackberry cellular telephones and some of appellant's clothing.

Tullahoma Police Department Detective Dale Stone was the State's next witness. Detective Stone elaborated that when they spoke with appellant outside of Harton Hospital, he indicated that he had suffered a seizure and dropped the victim. Detective Stone asked if appellant would agree to continue the interview at the police department because several people had walked by and were upset and he believed they needed to speak more privately. Appellant accompanied them voluntarily and rode in the front seat of Detective Brazier's vehicle. At the police department, Detective Stone read appellant his rights.

Detective Stone recalled appellant's version of the day's events as follows: Appellant reported that R.K. left the house at 9:30 a.m. He awoke at 10:00 a.m. and woke up the victim. He took a shower and gave the victim a bath. Around noon, they went outside to play. The victim was playing and kicking a football when he began to cough. They went inside. Thirty to forty-five minutes later, around 1:00 p.m., the victim began to cough more, and appellant administered a breathing treatment with the nebulizer. The victim turned "light blue," so appellant called 9-1-1. He used a suction instrument to remove mucus from the victim's nose and throat. The victim stopped breathing, so appellant called 9-1-1 again, and the ambulance arrived shortly thereafter. Detective Stone asked appellant if that was everything, and appellant said that it was.

Because appellant's initial recitation of the events did not include his having a seizure, Detective Stone asked appellant to elaborate on that point. Appellant added that approximately fifteen minutes before he administered the breathing treatment to the victim, he experienced a seizure while holding the victim and that when he fell, the victim struck his head on the side of the bed rail. When appellant regained consciousness, the victim was beside the bed crying, and appellant noticed that the victim had a "busted" lip, so he used a pants leg to wipe off the blood. He also applied a cold compress to a cut on the back of the victim's head. He reported that the victim said, "'Cold, cold,'" when he did so. Appellant told Detective Stone that at 12:17 p.m., he recorded a video of the victim after the fall because he believed that he "wasn't acting right" and wanted to show it to R.K. He showed the video to Detective Stone and gave him permission to make a copy of it. Detective Stone said that the video showed that the victim was in distress but that he had no visible injuries at that time. Detective Stone said that appellant reported that he had failed to take his Depakote that morning and that he had experienced seizures since he was ten or eleven years old.

At that point in the interview, they took a break, and Detective Jason Kennedy entered the room to ask further questions. He had taken photographs of the victim and asked appellant about each one. Appellant gave the following explanations for the listed injuries: laceration on the back of the head, from the fall; busted lip, from the fall; bruises on his back (one large and several small), one small one from the fall and others "could have been" from playing outside when appellant "swung [the victim] around"; cut under chin, fell outside on the deck; and fingerprints on his neck, appellant's grip when he had the seizure. Appellant also explained that the victim had bitten him earlier, so appellant bit him back on the leg and the arm to "teach him a lesson" and then spanked him.

On cross-examination, Detective Stone acknowledged that it seemed that appellant was incorrect about the time line of the day's events. He also confirmed that questioning of appellant was an interview, not an interrogation, and that appellant was not in custody and could have left.

On redirect examination, Detective Stone recalled that appellant attributed the victim's black eye to an injury on a prior occasion. Appellant offered no explanation for the injuries that were obviously sustained after the 12:17 p.m. video that was allegedly recorded after the fall. On recross-examination, he confirmed that appellant's first call to 9-1-1 was placed at 2:32 p.m.

The State called Investigator Jason Kennedy with the Tullahoma Police Department as its next witness. He was working a different case at the hospital on March 9, 2010, when he was directed to investigate the instant case. He arrived in the emergency room area between 3:00 and 3:30 p.m. and was met by Detective Stone. Detective Stone advised that a child had died under suspicious circumstances and asked Detective Kennedy to take pictures and gather more information.

When Detective Kennedy saw the victim, he observed several bruises on his face, his chest, his back, his lower back, and his pelvic region. With the assistance of Dr. Seyler, Detective Kennedy moved the victim about to take pictures. When Detective Kennedy spoke with R.K., she was very upset. She pointed out a mark on the victim's nose and one on his forehead that had been there before the day in question, but with regard to the remaining injuries, "[s]he just said, in tears, 'These weren't here. I don't know what happened.'"

Detective Kennedy testified that following his interview with R.K. and his taking photographs of the victim, he drove to the police department and spoke with other detectives. He also viewed the video that appellant had recorded. He then entered the interview room to ask appellant some questions. Appellant reported that he had experienced a seizure. When asked about all of the other injuries on the victim, he replied, "'He's a crash kid. He runs

-9-

into things.'"  At that time, Detective Kennedy left the room and printed off four pictures: one of the bruising around the victim's neck; one of the back of the victim's head where a "knot" had formed; one of the victim's back depicting several bruises; and one of the victim's face.  Appellant explained the bruises on the victim's back by saying, "'Well, that is probably from where I was outside earlier playing with [the victim], lifting him up in the air, twisting him around.'"  With regard to the bruises on the victim's neck, appellant replied, "'Well, duh.  Them [sic] are my fingerprints because when you have a seizure, you grip.'"  Appellant said that the picture of the back of the victim's head reflected the injury he sustained when he struck his head on the bed rail during appellant's seizure.

Detective Kennedy recalled appellant's explanation of the time line, which was consistent with Detective Stone's testimony.  He explained that in the video, the victim had no apparent injuries on his body.  When questioning appellant about that fact, he responded, "'That's the way it happened.'"  Detective Kennedy asked appellant why over two hours had elapsed between the video recording and his 9-1-1 call, but appellant "really couldn't give a good explanation."  Appellant was not able to explain any injury that the victim sustained following the recording of the video.  Detective Kennedy seized appellant's telephone as evidence and released him that evening.  Detective Kennedy stated, "[M]y suspicion was that there was something more that happened, but I could not be sure until we had the autopsy performed the next morning."

Accordingly, Detective Kennedy attended the victim's autopsy the following morning.  As a result of the findings, Detective Kennedy "obtained more probable cause to obtain an arrest warrant" for appellant.  He called in the information to his supervisor, and other officers effected appellant's arrest.  When Detective Kennedy arrived at the police department, he repeated appellant's rights to him and advised him about the charges being brought against him.  Upon questioning, appellant said, "'I have already told you.  I don't want to confuse things or mix things up.'"

Detective Kennedy testified that as part of his investigation, he searched R.K.'s home on Circle Drive.  He provided a copy of a layout he had prepared along with photographs of the residence that he had taken.  He also seized the following pieces of evidence: a "cut-off" pair of pants from the bedroom where the alleged fall occurred; three towels with "reddish-brown stains" found near the bed; a pair of brown "cut-off" pants from R.K.'s bedroom; a pair of pants and a shirt belonging to the victim that had reddish-brown stains; a green towel found in the living room; a clothing tag with a reddish-brown stain and a fingerprint in the stain; a pair of the victim's boots found on the kitchen table; and a cutting of fabric from a kitchen chair that had a reddish-brown stain.  Detective Kennedy took a buccal swab from appellant and submitted it for analysis along with the physical evidence.

The State introduced the cellular telephones of appellant and R.K. through Detective Kennedy. He identified the clothing worn by appellant on March 9 and March 10 that was also taken into evidence. Finally, through Detective Kennedy, the State introduced the left side of the bed frame upon which the victim allegedly struck his head.

Detective Kennedy further testified that he was present during the entire autopsy of the victim, including the time that the medical examiner took photographs. He identified external photographs of the victim taken during the autopsy, described the injuries that he observed, and relayed appellant's explanation for each injury. During Detective Kennedy's testimony, the State played the video that appellant recorded of the victim. Detective Kennedy confirmed that appellant was never able to provide an explanation for why there were no visible injuries on the victim at that time.

The State called Tennessee Bureau of Investigation ("TBI") Special Agent Forensic Scientist David Hoover as its next witness, and he was accepted by the court as an expert in the field of latent print analysis. Agent Hoover testified that he received some clothing tags and two trophies to analyze and compare with the known fingerprints of appellant. He positively matched appellant's left palm print to a latent print on one of the clothing tags.

The State's next witness was TBI Special Agent Forensic Scientist Chad Johnson, who testified as an expert in the field of forensic serology. As part of his analysis, Agent Johnson received a blood standard from the victim and a buccal swab from appellant. He identified the victim's blood on a pants leg, a Winnie the Pooh towel, a shirt and pair of pants of the victim, a purple towel, a cutting from a dining room chair, one of appellant's t-shirts, and a clothing tag that had appellant's palm print on it. He also identified appellant's blood on a green towel. Agent Johnson's analysis of the bed rail failed to reveal the presence of blood.

TBI Special Agent Criminal Investigator Joel Wade, an expert in computer forensics, testified next. He analyzed two Blackberry Storm cellular telephones that belonged to appellant and R.K. and prepared a report isolating both telephones' activity on March 9, 2010. Agent Wade noted that appellant's telephone contained a video of the victim that was last played on March 9, 2010, at 6:18:26 p.m.

On cross-examination, Agent Wade acknowledged that due to the "volatile" nature of the memory in cellular telephones, there was the possibility that some text messages or telephone calls may have been missing from his report. He testified that upon further analysis, he could positively state that the video of the victim was recorded at 12:17:22 p.m.

-11-

The State's next witness was Dr. Clifford Seyler, a pediatrician of thirty-eight years, who was accepted by the trial court as an expert in the field of pediatrics. He was present at Harton Hospital on March 9, 2010, and responded to the pediatric code involving the victim in this case. He arrived at the examining room about the same time as the victim, and he encountered EMS attempting to resuscitate the victim. He observed that a breathing tube had been inserted and that personnel were performing CPR. He immediately assessed the victim but could not discern a heartbeat or breath sounds. He ordered the tube to be removed, and CPR continued using the "bag-to-mask" method. Medications were administered, and an IV line was established so that fluids could be given. The electrodes attached to the victim's chest revealed that he was in "asystole," meaning that he did not have a heartbeat. After twenty to twenty-five minutes of resuscitative efforts, the victim did not respond, and Dr. Seyler "called the code."

Dr. Seyler testified that he was unable to obtain a "satisfactory answer" for the multiple bruises and abrasions observed on the victim, so his preliminary diagnosis of the victim's injuries and death was child abuse. Dr. Seyler described the injuries to the victim, noting first that he had blood collected around his nostrils. The victim also had a hyphema in his right eye, which resulted from trauma to the eye that caused it to fill with blood. He also noticed petechia in the victim's eye. Dr. Seyler observed a "linear lesion" on the back of the victim's scalp that had crusted and clotted blood on it and "three-finger-like" contusions to the neck that could have been caused either by direct pressure or a slap to the neck. The inside lining of the victim's cheek was macerated or injured on both sides. There were several small bruises on the victim's chest, but they did not form a pattern. When they turned the victim over, Dr. Seyler observed multiple bruises on the victim's back that appeared to be in the shape of a shoe complete with tread marks. On the victim's extremities, Dr. Seyler noted multiple bruises. He stated that he also noticed "livor," a condition in which, upon death, the blood drains from the highest point in the body to the lowest point. Dr. Seyler testified, "In my experience, with over 75 deaths in my whole career, I had not seen it set in that fast from resuscitation . . . . It indicated to me that the child was, at the time of arrival, really dead at that point in time and that all our efforts were for naught . . . ."

Dr. Seyler stated that R.K. was escorted into the examining room and that he questioned her about the victim's condition premortem. He identified some photographs of the victim that were taken in the emergency room and confirmed that neither he nor anyone on the treatment team handled the victim in such a way as to cause any of the injuries.

Dr. Seyler was asked to describe the symptoms of an asthma attack. He described that in a mild attack, one might exhibit a persistent cough or "wheeze" when he exhales. In a moderate attack, one might struggle to breathe and may not be as active as usual because of the struggle. During a severe attack, a child would limit his activity to that necessary to

-12-

breathe, and one would witness the chest heaving. The child might also become cyanotic, or his skin would turn blue in appearance. Against that backdrop, Dr. Seyler viewed the video that appellant took of the victim at 12:17 p.m. on March 9, 2010, and opined that the victim did not display signs or symptoms of an asthma attack in the video. Rather, he stated that the victim had ataxia, which is "the inability to move the body in a coordinated fashion" while walking or standing.

On cross-examination, Dr. Seyler denied that resuscitative efforts could have caused the injuries he viewed on the victim. He also stated that if appellant had been instructed to manually remove the phlegm from the victim's throat, that would have been an incorrect instruction because phlegm "is not going to do anything except maybe lubricate the area." He said that it would be "extremely unusual" for phlegm to be present to such an extent as to clog the airway and that he had not witnessed such an occurrence in his thirty-eight years of practice.

On redirect examination, Dr. Seyler further explained that in the video, the victim was "markedly ataxic." He described, "[The victim] can't [sic] hardly stand on his own two feet. He is confused. He's disoriented. He doesn't seem to hear well. His name is called twice, and he doesn't turn around and reflect that he has heard that. He is desperately trying to stay afoot, and his balance is way off." Dr. Seyler opined that a common cause of ataxia was injury to the brain and that he would have ordered a CT scan if a child had presented to the emergency room in that condition.

Dr. Seyler generalized that a "vigorous, active child is going to bruise." He named the most likely places to find bruises on children and noted that the bruises on the victim in this case "were not in common areas for us to see." He concluded, "[T]he fact that there is a "sheer large number of these bruises that I can't explain, that brings my child abuse antenna sky high." Dr. Seyler opined that "the hand marks on the neck are almost pathognomonic of child abuse. Pathognomonic means you can make the diagnosis of child abuse on the basis of those marks on the neck." Finally, with regard to the video, Dr. Seyler said:

> I can tell that this child is not more than mildly wheezing. If he is wheezing at all, he is only wheezing because he doesn't have the other associated signs and symptoms of somebody who is in extremis for asthma. If you have labored respirations, his chest would be heaving. He would be sitting still. He wouldn't be moving around, and if you look at the video, anybody . . . would say that child is in extreme danger and severely ill at that point in time, severely ill, not just a little bit ill, severely ill.

The State called Captain Frank Watkins with the Coffee County Sheriff's Department as its next witness. He served as the administrative captain and was responsible for the technology utilized in the jail, including the telephone system. He was asked to retrieve the recordings of two telephone calls between appellant and his mother, Marsha Greenwood, while appellant was incarcerated. Those recordings were entered into evidence.

The State then called medical examiner Dr. Amy McMaster as an expert witness in the field of forensic pathology. Dr. McMaster performed the autopsy on the victim's body. She stated that in the course of her external examination of the victim, she observed multiple blunt trauma injuries to different areas of his body. She described several abrasions, or scratches, on the victim's extremities. She noted the following injuries on his head, neck, and torso areas: multiple abrasions and contusions on the face; a black eye with abrasions on the upper and lower lid; a large abrasion on the back of the head; a linear abrasion on the side of the neck; some bruising behind the right ear; a large linear abrasion on the left side of the back; a "complex" or group of abrasions on the right upper back; a linear abrasion on the left mid-portion of the back; an area of "patterned contusions," or bruises with a pattern or regularity, on the lower back/buttocks area; small abrasions on the lower back and left buttock; a dark red round contusion on the right lower abdomen; and round contusions on the left pelvic area.

Dr. McMaster characterized the bruise behind the victim's ear as "significant" because of its location. She described it as a "protected area" that would "somewhat raise your suspicion." She explained that upon beginning the internal examination, she noted blood in the "deeper portion of the abdomen" that exuded from an "extensive hemorrhage in the mesentery of the [small] bowel." She noted bleeding in the supporting tissue around the stomach and in the area surrounding the right part of the large bowel. There was an "extensive hemorrhage" in the back of his body behind his kidneys. She characterized this area, also, as "another protected area" and stated that a hemorrhage in that location indicates a significant blunt trauma. Dr. McMaster opined that it would require "a fairly significant amount of force to do that" and not "just a trivial fall or a trivial bump into something." The victim also had a hemorrhage around his pancreas, which is deep within the abdomen. When examining the victim's spine, Dr. McMaster found extensive "diffuse" or widespread hemorrhaging in different layers surrounding both the upper and lower spinal cord. She testified that the only explanation for the hemorrhages was blunt trauma and that the injuries would have required more than one blow. She said that the injuries she observed on the victim were not what one would see "with a normal activity of a toddler" and that they would have resulted "from something that generate[d] quite a bit of blunt trauma, either being hit, . . . kicked, falling out of a second- or third-story window, [or] falling down a bunch of stairs." Moreover, in her training and experience, "there was no way that [CPR], either by

-14-

a trained or untrained person, would explain the extensive injuries that we see in different areas of [the victim's] body."

With regard to the injuries on the victim's face and head, Dr. McMaster testified that perhaps some of the abrasions or contusions around the victim's mouth could have resulted from CPR but that none of his other facial injuries could have been explained that way. The abrasion underneath the victim's chin was large and was not a typical injury a toddler received. The linear abrasion on the back of the victim's head was surrounded by contusions just below it and would have resulted from more than one blow. Dr. McMaster characterized the injuries on the victim's head as having resulted from "multiple blows." During the internal examination of the victim's head, Dr. McMaster noted diffuse subgaleal hemorrhages on the back of the scalp, on the left side, and on the right side that were caused by blunt trauma. He had a patchy subarachnoid hemorrhage that could have been caused by other means, none of which were present in this case. He also had diffuse, extensive bleeding over his brain on both sides measuring about forty milliliters. Neither type of hemorrhage could have been caused by CPR. Dr. McMaster characterized the victim's head injuries as "extremely serious[,] . . . lethal, even without any of the injuries" she observed. She said that the bleeding in the abdominal organs was more difficult to "quantify" because of the location but that the injuries would have been painful and could have caused shock. She could not definitively state whether the abdominal injuries would have been fatal. The multiple injuries, taken together, would have been more severe than had they occurred separately.

Dr. McMaster noted that she found ibuprofen in the victim's blood but that it was not a level of concern. Due to the abrasions on the victim's neck, she performed a special neck dissection and noted a hemorrhage to the submandibular gland, which was located in that area. She also noted a hemorrhage in the victim's eye, which was consistent with blunt trauma.

Dr. McMaster opined that the cause of death was multiple blunt force trauma. The "mechanism" of death was swelling of the brain. She considered asthma as a cause of death but determined that it made "no medical or scientific sense in a child that has extensive bleeding around his brain, extensive bleeding with his internal organs, evidence of blunt trauma on the outside of the body as well, . . . to certify the cause of death as asthma when there are injuries to explain his death." She testified with medical certainty that the victim's death was not precipitated by resuscitative efforts. The State reviewed appellant's version of the events surrounding the victim's death, and Dr. McMaster stated that her opinion did not change. She explained the symptoms that the victim would have experienced as follows:

-15-

[W]ith swelling of the brain, . . . they will begin to have an altered consciousness. They will begin to be quite not themselves, for lack of a better term. They will have difficulty with their orientation as to where they are. Eventually, once the brain swells enough, then they will begin to become unresponsive. They will begin to have difficulty breathing, and that is specific with brain injury. With the abdominal injury, [it] would be painful. He also might have difficulty breathing just because of the muscle – the motion of your muscles of your abdomen when you breathe. It would be hard for him to breathe. It would be painful and would be difficult to breathe.

Dr. McMaster further stated that the victim would have "become symptomatic within a very short period of time." Following this testimony, the State rested its case-in-chief.

Appellant testified on his own behalf and stated that he knew R.K. from high school. They met during a physical education class but did not have a dating relationship. He moved out of the area, and when he returned in December 2009, he had a chance meeting with R.K. On March 9, 2010, the two had been dating for a month to a month and a half. Approximately two weeks prior to that date, he began living at R.K.'s house while he looked for a job. After he found employment, appellant planned to rent a house or apartment with a friend.

Appellant stated that he and R.K. got along well. He met the victim on his second date with R.K. The three of them participated in several activities together, and appellant said that he and the victim got along "real well." Prior to March 9, he had babysat the victim "probably three" times and never experienced any problems while doing so. Appellant said that he liked babysitting the victim. He also enjoyed spending time with his nieces and nephews.

Appellant said that on March 9, 2010, he and R.K. had arranged in advance for him to watch the victim while she attended her sister's child custody hearing. That morning, he and R.K. shared her bedroom, and the victim slept in his own room down the hall. When appellant awakened, the victim was awake and playing in the hallway outside his bedroom. While the victim watched television and played in his bedroom, appellant showered and dressed. Appellant recalled that he then took the victim outside to play. The victim kicked his football and rode his tricycle. Appellant played with the victim and "had him in [his] arms . . . spinning around." They stayed outside for approximately thirty minutes. During that time, he was in "continuous contact" with R.K. Appellant explained that they went back inside because the victim displayed breathing problems and was coughing. However, on the way inside, the victim fell and struck his chin on the steps. His breathing had become "heavy," and he was "wheezing a little bit."

-16-

Appellant testified that he contacted R.K. and that she directed him to administer a breathing treatment. He located the equipment but could not find the vials of medication. As he looked for the vials, he observed the victim standing in a chair in the kitchen drinking from a bottle of children's Motrin. He relayed this to R.K., who told him to "keep a close eye on him." Appellant said that the victim had previously opened a bottle of medication and that he and R.K. were aware that he could do so.

Appellant stated that he recorded the video that was entered into evidence because he wanted to show R.K. the victim's behavior. He said that he attempted to send it via cellular telephone but that it was too long to transmit. Appellant explained that he experienced his first seizure when was around eleven years of age. He said that he experienced them frequently and that a seizure could be brought about by stress, lack of sleep, or failing to take his medication at the prescribed time of day. He described that a "small" seizure would cause an "involuntary . . . full body muscle spasm," and that a grand mal seizure would involve convulsions. When he emerged from a seizure, it would often take a moment for him to recognize his surroundings. He said that R.K. had witnessed a "smaller" seizure and that he dropped his telephone and "went down." He explained that when a seizure struck, he was not able to catch himself and prevent himself from falling.

Appellant testified that on the morning of March 9, he was holding the victim when appellant suffered a seizure. He was walking toward R.K's bed with the intention of placing the victim in the bed to rest because of his having ingested children's Motrin and because of the asthma symptoms he was experiencing. However, appellant said that he did not make it to the bed and that he fell toward the bed during the seizure. He stated that when he became aware of his surroundings after the seizure, the victim was on the bed holding the victim's head. Appellant reported that he was still "twitching" as he stood up and made his way to the dresser to get his prescription medication. In the process of removing the medications from the bottles, he dropped several of the pills on the floor. As appellant turned his attention to the victim, the victim was saying, "Hurt, ow, hurt." Appellant maintained that he cared for the victim as well as he could but that he was physically incapable of picking him up at that point.

Appellant recalled that upon examining the victim, he observed that the victim had an injury on the back of his head from the fall. That was the only mark that he noticed on the victim. He retrieved some ice and a piece of clothing and had the victim recline in the bed while he applied ice to the injury. He also noted that the victim's lip was bleeding. He wiped the victim's lip with a pants leg. Appellant stated that he telephoned R.K. to report to her the victim's symptoms and recent head injury and that R.K. advised him to "keep an eye on him." Appellant said that he told R.K. about the victim's breathing problem, about his ingesting children's Motrin, and about appellant's falling and dropping the victim during

-17-

a seizure. Appellant testified that he could not state with certainty whether he recorded the video of the victim before or after his seizure. However, after viewing the video and comparing his version of the events to it, appellant surmised that he recorded the video before he had the seizure.

Appellant said that after his seizure, he lay on the bed with the victim for a short time, during which he thought that the victim's breathing became more labored. He described the victim's breaths as being "deeper and more spaced apart." When his attempts to reach R.K. failed, appellant telephoned 9-1-1. The operator instructed appellant that if the victim stopped breathing, he should call back. Appellant said that he did as instructed and called back shortly thereafter. The operator guided him through CPR, and appellant followed the directions. However, the operator offered no guidance as to how to place his hands, how many hands or fingers to use, how hard to press, or where exactly to press on the victim's chest. Appellant said that the operator asked whether anything was blocking the victim's airway and that if there was, he should remove it. Appellant did so and removed some phlegm, which caused the victim to "gasp" as though it was a relief for air to reach his lungs. He continued CPR until the emergency medical personnel arrived. Appellant said that he thought the victim was dying.

When emergency medical personnel were attending to the victim, one of them asked appellant how the victim had sustained the scratches and the injury to his head. He explained that he had a seizure while holding the victim and that he had dropped him. He also recalled that the scrape on the victim's chin happened earlier in the day as they were walking back inside the house and the victim tripped and struck his chin on the steps. Appellant said that he traveled to the hospital voluntarily and that his sister drove him there. He denied making the statement to R.K. at the hospital that he hoped she would not "try to get [him] for child abuse." He recalled that he told a nurse what had happened throughout the day and that he told her about the victim's asthma. He did not recall having spoken with Dr. Seyler. He acknowledged speaking with Detective Stone and the "bigger detective."

Appellant testified that when speaking with the detectives, one of them asked how his day was going, and he replied, "'Not good at all.'" He explained to the detectives the chain of events of the day, and someone said that appellant needed to answer further questions at the police station. Appellant rode with officers to the police station, where he was escorted to an interview room. He claimed that at one time, four or five detectives were present in the room with him and that their attitudes were "very hostile." He said that the detectives made "strong accusations towards [him]." Appellant confirmed that officers read him his rights and then asked him "many" questions.

Appellant contended that the victim obtained a black eye the day before his death when he ran into a doorknob in the house. He said he told officers that the victim was a "crash kid" and that "he was very clumsy." He also stated that the victim bit him and that he utilized the same disciplinary procedure he had witnessed R.K. employ - biting the victim in return and "popping" his hand. Appellant explained that the bruises around the victim's neck were caused by his hand when he was holding the victim and the seizure struck. Appellant admitted that upon further consideration, the time line that he originally gave the detectives was "not very accurate."

Officers allowed him to leave that night after questioning, and he was arrested the following morning. After he was arrested, they interviewed him "for a few short minutes," and then appellant requested an attorney. Appellant claimed that he had no reason to hurt the victim and that he did not intentionally injure the victim. He testified that he did not physically abuse the victim in any way on March 9, 2010.

On cross-examination, appellant admitted that although he originally told the police that R.K. left the house around 9:30 a.m. on March 9, he, in fact, did not know what time she left. Appellant acknowledged that he awakened around 10:30 a.m. The State questioned appellant about a text message from R.K. at 10:35 a.m., in which she asked how the victim was doing. Appellant replied at 10:36 a.m. that he was "fine" and "playing in his room." Appellant then straightened up the house a bit and made himself a sandwich and the victim some cereal. He bathed the victim and then took a shower. Afterward, they went outside to play. Appellant explained that his hands were around the victim's hips and under his arms as they played together outside but that he "didn't say for sure . . . that's exactly where [the bruises] came from." He confirmed that the only injuries he had previously seen on the victim were on the tip of his nose, on his forehead, and on the back of his head. Moreover, when appellant bathed the victim that day, he saw no other injuries on his body.

In response to further questioning, appellant asserted that when they were playing outside, the victim began to experience a "slight wheeze." They went inside, and appellant called R.K. On the way inside, the victim fell and scraped his chin. He confirmed, after reviewing the telephone records, that R.K. called him at 11:05 a.m. but that she did not reach him. She called again at 11:07, but he did not answer. She then texted at 11:08 and wrote, "'You need to answer the phone. You've got my kid.'" Appellant explained that he missed the previous telephone calls because he was outside with the victim. Once inside, he called R.K., but she did not answer. She returned the call at 11:32 a.m., and appellant answered the telephone and told her about the victim's difficulty breathing. She instructed appellant to administer a breathing treatment to the victim.

-19-

Appellant stated that he retrieved the machine from the living room and took it into the bedroom he shared with R.K. The victim was not in the bedroom at that time. Appellant then left the room to retrieve the vials of medication, which had fallen behind the entertainment center in the living room. When he returned with the medication, the victim was in the kitchen and had ingested children's Motrin. Appellant did not immediately administer the breathing treatment but rather observed the victim and noted that "he was acting very funny." He contacted R.K., who told him to "'[w]atch [the victim], and if he gets drowsy, . . . let him sleep it off.'" At that point, appellant had still not administered the breathing treatment to the victim. He also did not inform R.K. about the scratch on the victim's chin.

Appellant testified that he then began to "observe" the victim as he played. He characterized the victim's behavior as not "normal" and said that "the Motrin had - to [him], it seemed like, beg[u]n to make [the victim] dizzy." He elaborated that the victim was still having difficulty breathing but that "it was not as bad as it was while [they] were outside."

During cross-examination, appellant equivocated about whether the victim struck the bedrail of the bed or a dresser in the room. He was certain the victim did not strike the footboard of the bed. Appellant was also unsure about whether he recorded the video of the victim before or after his seizure. He stated:

> I am not sure if I told [the detective] if it was after or before. I had a lot of questions being asked toward me. I was - I had four to five people talking to me at first. I had three, then four. There were many questions I was being asked. I'm not sure, but as to my knowledge, now looking back at the records and the video, that the video was taken, and then I had my seizure, to the best of my knowledge. That's what it seems to appear to me.

However, the State clarified that appellant had told his mother something different in a telephone call from the jail: "[I]n the recording of you talking to your mother, you told her, didn't you, that the reason you took the video was how strange [the victim] was acting after he hit his head[,] is that not correct?" Appellant responded, "I believe so, sir." To explain this discrepancy, appellant said, "The behavior of a seizure, more or less, the memory when it operates after a seizure, if something happens a minute before your seizure, you would think it happened a day before, so I still went under the assumption that it was the . . . seizure and then the video." He stated that he was still "not 100 percent sure when [he] shot the video, but it was for [the victim's] behavior for [R.K.] to see because [he] didn't know what to do."

The State asked appellant about the content of the 12:27 p.m. telephone call between him and R.K. Appellant first claimed that he told R.K. that he recorded a video of the victim and then retracted the statement, explaining that he did not "know as far as [him] saying [he] . . recorded a video of [the victim], but [he] explained to her over the phone call what [he] had seen [the victim] do, how he was behaving, and how he was acting. He said that R.K. did not instruct him to call 9-1-1.

Appellant said that he could only "guess" that he did not recover from his March 9 seizure for fifteen to twenty or perhaps thirty minutes. When he regained awareness, he immediately retrieved his medication "to further slow the seizure down." In doing so, appellant noticed that an incense burner and lighter had been knocked to the floor during his seizure. By viewing the video, he believed that the video must have been recorded prior to his seizure because the incense burner was still in its proper place in the video. However, upon further questioning, appellant acknowledged that there were two, possibly three, identical incense burners in the bedroom that day.

Following his seizure, appellant communicated with R.K. several times by text messages and by a telephone call, but based upon his description of the events, she did not advise him to call 9-1-1. She stated that she would be released from court soon and that she would be back shortly to care for the victim. She instructed appellant to "'watch him closely.'" Appellant lay beside the victim while applying the ice pack to his head and played video games.

Appellant admitted that at 1:02 p.m., he sent a text message to R.K. informing her that the victim was grinding his teeth so badly that his mouth was bleeding. He confirmed that he had experienced the seizure at that point but that he had not administered a breathing treatment to the victim. During the time appellant lay in the bed beside the victim, he arose once to go to the restroom, but the remainder of the time, he stayed in the bed. As he was playing the games, appellant noticed that the victim's breathing became worse. The victim uttered some words and shortly thereafter, his breathing became "so severe that there was a big gasp." The victim then took two or three deep breaths. "[T]hat's when [he] noticed that things were really serious[] [and] that it was time for proper treatment instead of R.K.'s opinion. Appellant had a "gut feeling." He sent R.K. several text messages informing her that he was going to call 9-1-1 for the victim. At 1:46 p.m., he described the victim to R.K. as being "[j]ust dead to the world." Appellant said that he attempted clapping at the victim to obtain a reaction but that the victim was unresponsive.

During further cross-examination, the State elicited testimony from appellant that he exchanged text messages with a friend of his named "Deaton" at 1:56 p.m. and that he wrote, "Bored as s**t. Watching [the victim] while [R.K.] at court." Appellant explained that he

-21-

wrote that when he thought that the victim's condition was improving. At 2:08 p.m., he telephoned his sister Courtney to request her to bring him something to eat. Appellant sent a text to R.K. at 2:32 p.m. saying that the victim was acting "really weird like he can't breathe" and then called 9-1-1 at 2:33 p.m. He received a text from R.K. at 2:46 p.m. instructing him to administer a breathing treatment. However, appellant subsequently stated that he "tried placing [the victim] on the machine, and he pushed it away from his face, and then yes. Yes, I called the first 9-1-1 call." The State then questioned appellant about the content of the 9-1-1 tape wherein he stated that the victim had been on the machine for fifteen minutes prior to his calling.

The State also questioned appellant about a telephone call between him and his mother on March 14, 2010, in which he stated, "'I knew he was going to die, and I picked him up. I didn't tell them this - but I picked him up, and I just squeezed.'" Appellant denied any recollection of that telephone call, and it was played for the jury.[2] Afterward, appellant added:

> I did grab him. I was scared. I wanted - I tried to keep him conscious. I didn't violently shake him, no. His eyes kept opening and closing. I didn't want them to stay closed. I wanted them to stay open. I don't doubt that I shook him to an extent that caused any serious harm; I just wanted his eyes to stay open.

Appellant's next witness was Dr. Thomas Young, who was accepted as an expert in forensic pathology. He was retained by the defense to provide an opinion as to the victim's cause of death. He opined that "to a reasonable degree of medical certainty[,] . . . the cause of death of [the victim] [was] bronchial asthma and that the manner of death [was] natural." In rendering his opinion, Dr. Young found the 9-1-1 calls and the video of the victim to be "significant."

Dr. Young stated that with regard to 9-1-1 calls, they are typically placed when things become "desperate." During the first call, appellant reported that the victim was receiving a breathing treatment and that he was still awake and alert. Therefore, the operator instructed him to call back if the victim's condition changed. When the victim's condition worsened, appellant called back and was instructed to begin CPR, which he did. Dr. Young also commented on the video, stating, "The child looked to be in distress, and he was even whimpering a little bit, and he was very unsteady on his feet at that particular point." He found it "interesting" that there was "no evidence of any injury in the child . . . The child

---

[2] The compact disc containing a recording of the telephone call had been previously admitted as Exhibit 82.

didn't look beat up . . . The child was behaving in a fashion where he appeared in distress, and he was also unsteady on his feet, but there wasn't any evidence of any injury in the child."

Dr. Young attributed several of the cuts and scrapes on the victim to CPR. He explained that they were "bloodless" injuries and that the areas would have bled if the victim's heart had still been beating. He reasoned that when a severe asthma attack ensues and the person cannot take in sufficient oxygen, the body circulates blood to the most vital areas, which would be the heart and the brain. This, Dr. Young opined, caused the victim's brain, spinal cord, and vessels in the backs of his eyes to "ooze," which would explain the autopsy findings of hemorrhages. In further support of his opinion, he also noted the presence of a certain type of cell that surrounds "reactive airways" in an asthma attack and evidence of bronchial pneumonia. Dr. Young explained that the hemorrhage in the membranes in the abdominal region were caused by appellant's incorrect hand placement during CPR. In sum, Dr. Young stated:

> This is a child who stopped breathing, and every attempt that was being made in the emergency room and everything was to get the child's heart going again. All of this put together, the frantic nature of trying to do the resuscitation, and the drying out of these post-mortem injuries . . . and the nature of the areas of the bleedings in the body, plus the evidence of asthma in the lungs and damage to the brain from a lack of oxygen, all this allows me with reasonable medical certainty to conclude that the cause of death is bronchial asthma. The manner of death is natural, and that what has basically been characterized as a child abuse case is a horrible mistake.

Dr. Young expounded that the victim's distress in the video was caused by "impending lethal bronchial asthma." He said that the bronchial pneumonia was "subtle" and "not widespread," so one would have to look carefully to see it. He added that bronchial pneumonia could make asthma worse by making it less treatable. Dr. Young also found "extensive" evidence of ischemia, or lack of blood flow, in the victim's brain, which occurred over a long period of time. He explained the significance of this finding:

> [A]sthma . . . can get better and it can get worse, and it can get better and it can get worse. It's a reactive airway disease, and sometimes it gets really bad, then it eases up, and then it gets really bad, and it eases up, and this could basically, if the child is undergoing this kind of cycle over a period of time, then by the time everything is done, you can basically see there is nerve cell damage in the brain just due to a lack of oxygen.

Dr. Young again addressed the hemorrhages in the victim's brain and stated that those were not indicative of a traumatic injury. He characterized the bleeding as a "generalized ooze, which is basically present through the skull and the spine, and it's typically seen in situations where there is a lack of oxygen and a lack of blood flow for a period of time." In contrast, if a traumatic injury occurred, "there is going to be a fairly rapid accumulation of blood." Moreover, Dr. Young opined that the victim did not die from the bleeding in his brain. He added that the bruises on the victim appeared to be very pronounced because of the hypoxia, or lack of oxygen supply, which caused the victim to bleed more easily and that the location of the bruises "fit" with resuscitative efforts. Dr. Young referenced the video recording once again and opined that the victim did not display signs of ataxia, but rather, he appeared as though he were going to pass out.

On cross-examination, after the State reviewed Dr. Young's conflicts at his previous employment, his new career testifying almost exclusively for criminal defendants, and his disagreement with the current methodology utilized in the diagnosis of child abuse, Dr. Young reiterated, "The only plausible explanation for those particular findings in the abdomen and the bruise on the back in the midline, it basically goes along with a person basically given instructions on how to do CPR on a 9-1-1 call, and then basically doing the best he can. It fits."

In rebuttal, the State recalled Dr. McMaster, who "disagreed[d] and [took] issue with several of Dr. Young's findings." First, she contested Dr. Young's findings that the victim had pneumonia. She stated that she noted acute inflammatory cells related to asthma but that he did not have pneumonia. Eosinphils are inflammatory cells associated with asthma; neutrophils are inflammatory cells associated with pneumonia. While the victim may have had "a few neutrophils," Dr. McMaster offered that "you probably could sample a lot of people's lungs and have a few neutrophils" without that person having pneumonia.

Dr. McMaster disagreed that the bruise on the victim's back could have been caused by CPR. She characterized the bruise as being "inconsistent" with resuscitative efforts. She pointed out that Dr. Young's testimony was inconsistent: she agreed that once the heart ceases beating, one does not actively bleed anymore, but she did not understand how Dr. Young could also say that the victim was bruised during CPR if, in fact, his heart had stopped beating. She said that if the victim's heart had, indeed, stopped, he would not have bruised.

Dr. McMaster agreed that injuries could occur as a result of CPR. However, she qualified that there is typically only one isolated injury, such as bleeding in the abdomen. She said that the victim's injuries "are not the types of injuries in the extent and character that you see associated with CPR."

Dr. McMaster disagreed with Dr. Young's characterization of the accumulation of blood in the victim's brain and abdominal region as "oozing." She flatly stated, "This was not oozing. This was blood. This was hemorrhage . . . . The character is different. The distribution is different, and it means very different things." She clarified, "It just doesn't have that appearance in my experience and in my training and what is described in the medical literature." To contradict Dr. Young's opinion with regard to hypoxia causing "oozing" or hemorrhage, Dr. McMaster reviewed the literature upon which Dr. Young relied and quoted a relevant portion: "'Further research is required to confirm whether hypoxia alone is causative of intradural hemorrhage and subdural hemorrhage in the human infant.'" She continued, "Even the authors of this study say there is no definite scientific evidence that hypoxia alone can cause subdural hemorrhage." She concluded, "Asthma was not mentioned to my knowledge in this article, and again, I find no connection between asthma or even an asthma attack and a subdural hemorrhage. There is no medical or scientific connection between the two."

With regard to Dr. Young's methodology, Dr. McMaster stated:

All of the findings related to the investigation have to be taken together, so in that respect, I agree. What I disagree with, however, is [what] Dr. Young characterized a "crisis" in forensic pathology and that he has an agenda about a crisis. I don't know about a crisis. I am not here to testify about a crisis. I am here to testify about these findings in this particular case and how, when all the findings are taken together, the best and most reasonable cause of death is multiple blunt force injuries.

Finally, Dr. McMaster noted that Dr. Young had failed to offer an explanation for the victim's black eye. She said that while he attributed some of the injuries around the victim's mouth to CPR, she had never seen a black eye described as a CPR-related injury. She concluded, "[W]hen all the factors are taken into consideration, I disagree very strongly with Dr. Young that the cause of death is not asthma. The cause of death is multiple blunt force injuries."

## B. Sentencing

### 1. Jury Sentencing Hearing – First Degree Murder

A jury sentencing hearing was held on March 30, 2012, at which the State sought a punishment of life without the possibility of parole. The State presented victim impact statements from M.W., the victim's father; L.K., the victim's grandmother; and R.K., the victim's mother.

Appellant presented Marsha Greenwood, appellant's mother, who testified that appellant was the youngest of three children and that she and her family had moved to Tennessee when appellant was four years old. Ms. Greenwood stated that appellant struggled in school because he suffered from attention deficit hyperactivity disorder ("ADHD") and epilepsy. She explained that appellant began taking medicine for his ADHD in the third or fourth grade. Ms. Greenwood stated that appellant did not have disciplinary problems at school or at home aside from things that were a byproduct of his ADHD. Appellant had his first seizure due to his epilepsy when he was in fifth grade and began taking medicine for the condition. Ms. Greenwood estimated that from that time until the present, appellant had endured between thirty and forty seizures. Appellant also visited his doctor "a couple of times a year" for checkups.

Ms. Greenwood testified that during high school, appellant participated in baseball, football, basketball, wrestling, and disc. However, he had knee surgery due to an injury incurred during a seizure, and he was unable to play sports in the same way. Appellant dropped out of school and received a general educational development ("GED") certificate. Ms. Greenwood testified that appellant assisted her father, Joe C. Riddle, "[w]ith cows and construction, mini barns, whatever [Mr. Riddle] needed him to do." Ms. Greenwood explained that appellant only acted violently when "it was to take up for somebody." Ms. Greenwood testified that appellant liked puppies, fishing, camping, walking, cooking, visiting friends, and playing video games. She explained that appellant was a generous person and would help others when needed. She also stated that appellant had many opportunities to be around her grandchildren and that he played and got along with them well.

Joe C. Riddle, appellant's grandfather, testified that appellant helped him work on his farm, build storage buildings, and remodel homes. He said that appellant was a good worker who followed instructions well and was respectful. Appellant did not act violently toward Mr. Riddle or anyone else. Mr. Riddle recalled seeing appellant have several seizures, two of which were severe.

Courtney Greenwood Gore, appellant's sister, testified that appellant was not violent while they were growing up. She explained that appellant participated in baseball, football, basketball, track, and wrestling until he injured his knee during a seizure. Mrs. Gore recalled one incident when appellant had a seizure, and he stopped breathing and turned blue, requiring her to perform CPR. Appellant then had to be transported to the hospital. Mrs. Gore stated that after a seizure, appellant "wasn't all there" and "you would have to explain [what happened] to him, sometimes more than once." She explained that it would take between thirty minutes and one hour for appellant to recover. Appellant had taken bartending classes and enjoyed cooking. Mrs. Gore also asserted that appellant had helped

raise her daughter, appellant's niece, for nine months while he lived with Mrs. Gore and her husband. Mrs. Gore never had any reason to worry about appellant's care of her daughter.

Clarissa Greenwood,[3] appellant's sister and Mrs. Gore's twin sister, testified that appellant liked to make others laugh and that he was very protective of her. She stated that there were a couple of instances when appellant went to her home to "make sure nothing bad would happen" between her and her child's father. She stated that appellant had played baseball and that to her knowledge, he had been respectful and had never had a problem with others while playing. Clarissa explained that after a seizure, appellant was "foggy" and "wouldn't remember anything." Clarissa stated that appellant had helped care for her son and that she never worried about appellant being violent toward either of her two children.

Justin Gore, appellant's brother-in-law, stated that he had known appellant since childhood and that they had played baseball together. He explained that appellant was an "amazing" player and was "very respectful to other players." Mr. Gore testified that appellant was "[f]antastic" around his daughter and that while Mr. Gore was gone on active duty with the Navy, appellant helped care for his daughter. Mr. Gore asserted that he did not worry about leaving appellant at his home with his family. While living with Mr. and Mrs. Gore, appellant had worked at Hooters and Chili's as a cook and waiter because he was an aspiring restauranteur. Mr. Gore also remembered appellant having a seizure that required Mrs. Gore to perform CPR on appellant. He stated that after a seizure, appellant was very confused and "just like out of it." Appellant's recovery time after a seizure depended on the severity of the seizure. Mr. Gore opined that appellant was a very friendly and generous person.

Samantha Smith, appellant's ex-girlfriend, testified that she and appellant dated for "close to two years." She explained that they ended their relationship after they "lost a baby" and that she "took it as [they] weren't supposed to be together." However, Ms. Smith stated that during the relationship, they spent time with their families and that appellant never mistreated her. Ms. Smith explained that appellant had interacted well with children in both her family and his own and that she had never witnessed an incident of violent behavior from appellant.

Bethel Campbell Smoot, a friend and business acquaintance of appellant's grandfather, Mr. Riddle, testified that he was an attorney but that he was also a part owner in some cattle with Mr. Riddle. Mr. Smoot explained that appellant worked with Mr. Riddle taking care of the cattle and grounds. Mr. Smoot recalled an occasion when appellant was

---

[3] Because appellant's mother and sister have the same last name, we will refer to Clarissa Greenwood, appellant's sister, by her first name for clarity. In so doing, we mean no disrespect.

painting a barn roof and he became unsteady and began acting strange. Mr. Smoot and Mr. Riddle recalled appellant from the roof because Mr. Smoot was afraid appellant was going to fall off the roof. Mr. Smoot opined that appellant was "in the process" of having a seizure that day. Mr. Smoot also stated that appellant had acted respectfully towards his grandfather and Mr. Smoot while working and performed tasks as asked. Mr. Smoot never saw appellant act violently.

The trial court instructed the jury regarding the following enhancement factors: (1) the murder was committed against a person less than 12 years of age, and the defendant was 18 years of age or over; and (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Tenn. Code Ann. § 39-13-204(i)(1), (5). The trial court also instructed the jury regarding the following mitigating circumstances: (1) the defendant had no significant history of prior criminal activity; (2) the youth or advanced age of the defendant at the time of the crime; (3) the defendant has no prior history of violent behavior; (4) the character of the defendant relative to family and friends, including background, support, and relationships; (5) the defendant's physical condition or record of medical conditions as they relate to his prior history and to any aspect of the circumstances of the offense; and (6) any other mitigating factor which was raised by the evidence produced by either the prosecution or defense at either the guilt or the sentencing hearing. *Id.* § -204(j)(1), (7), (9).

The jury unanimously found that the State had proven one aggravating circumstance — that the murder was committed against a person less than twelve (12) years of age, and the defendant was eighteen (18) years of age or over. *Id.* § -204(i)(1). However, the jury imposed a sentence of imprisonment for life.

## 2. Trial Court Sentencing Hearing

The trial court subsequently held a sentencing hearing on appellant's remaining criminal convictions on June 20, 2012, at which neither the State nor appellant presented any additional witnesses. The State submitted into evidence appellant's presentence report.

Defense counsel argued that the trial court should sentence appellant as an especially mitigated offender or that alternatively he should be sentenced as a Range I, standard offender. Defense counsel presented argument that each of the six possible enhancement factors should not apply. Defense counsel also argued that the following mitigating circumstances should apply: (1) the defendant, because of youth or age, lacked substantial judgment in committing the offense; and (2) the defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. Tenn. Code Ann. § 40-35-113(6),

(11). In addition, under the "catch-all" provision of section 40-35-113(13), defense counsel asked the trial court to consider in mitigation that appellant had no prior history of violent behavior; appellant's medical history and current condition; appellant's background, family history, and family relationships and support; the youth or advanced age of appellant; and that appellant had no significant history of prior criminal activity. Defense counsel also argued that appellant's sentences should be aligned concurrently.

The State argued that the following enhancement factors should apply: (1) the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (2) a victim of the offense was particularly vulnerable because of age or physical or mental disability; (3) the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; (4) the personal injuries inflicted upon, or the amount of damage to property, sustained by or taken from the victim was particularly great; (5) the defendant had no hesitation about committing a crime when the risk to human life was high; and (6) the defendant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense. The State also argued that appellant's life and aggravated child neglect sentences should be aligned concurrently but that appellant's aggravated child abuse sentence should be served consecutively to those two sentences.

The trial court took the matter under advisement and filed a written order on August 24, 2012. The court stated the following:

> In determining the appropriate sentences for these offenses, this Court has considered the evidence presented at the trial and the sentencing hearing, the presentence report, the principles of sentencing and arguments made as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on the mitigating and enhancement factors, any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, and any statement the defendant made, if any, on his own behalf about sentencing, and the defendant's potential for rehabilitation or treatment.
>
> . . . .
>
> The Court finds the following enhancement factors which are not themselves essential elements of this offense:

(4)     A victim of the offense was particularly vulnerable because of age or physical or mental disability; and

(6)     The personal injuries inflicted upon, or the amount of damage to property, sustained by or taken from the victim was particularly great.

. . . .

The Court finds the following mitigating factor:

(11)    The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct.

The trial court then sentenced appellant to serve two twenty-year sentences for his aggravated child abuse and aggravated child neglect convictions, to be served concurrently with each other and concurrently with his life sentence.

## III.  Analysis

Appellant raises eight issues for our review: (1) whether the evidence was sufficient to support appellant's convictions for first degree felony murder during the perpetration of child neglect, reckless homicide, aggravated child abuse, and aggravated child neglect; (2) whether the trial court erred by overruling appellant's motion to suppress all information contained in his cellular telephone, which was seized by law enforcement officers; (3) whether the trial court erred by overruling appellant's motion in limine and allowing hospital and autopsy photographs of the victim to be admitted into evidence; (4) whether the trial court erred by overruling appellant's motion in limine and permitting Dr. Seyler to testify with regard to the appearance of the victim's injuries; (5) whether the trial court erred by allowing Dr. Seyler to view the video recording of the victim and render an expert opinion based thereon; (6) whether the trial court erred by allowing Detective Stone to testify that marks on the victim's neck resembled fingerprints; (7) whether the trial court erred by permitting Amy Vickers to testify with regard to statements made by R.K.; and (8) whether the trial court erred in sentencing appellant.

### A.  Sufficiency of the Evidence

Appellant challenges the sufficiency of the evidence supporting his convictions for felony murder during the perpetration of aggravated child neglect, reckless homicide, aggravated child abuse, and aggravated child neglect.

## 1. Standard of Review

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

## 2. Felony Murder During Perpetration or Attempt to Perpetrate
## Aggravated Child Neglect and the Separate Offense of Aggravated Child Neglect

Appellant was convicted of felony murder with the underlying felony of aggravated child neglect. "First degree murder is: . . . (2) A killing of another in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy[.]" Tenn. Code Ann. § 39-13-202(a). One is guilty of aggravated child neglect who "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare," and such treatment resulted in serious bodily injury. *Id.* §§ 39-15-401(a),(b), -402(a)(1); *see State v. Mateyko*, 53 S.W.3d 666, 670 (Tenn. 2001). In this case, because the victim was less than eight (8) years of age, the evidence must have also proven the victim's age to establish the Class A felony. *Id.* § 39-15-402(b). This court has held "that before a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." *Mateyko*, 53 S.W.3d at 671-72. In this case, to sustain the conviction for felony murder, the State was not required to prove a culpable mental state except that necessary to commit the underlying enumerated offense. *Id.* § 39-13-202(b). When a defendant is convicted of both aggravated child abuse and aggravated child neglect, this court has emphasized the requirement that some evidence exist that the alleged act of neglect resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act of abuse. *State v. Lakeisha Margaret Watkins*, No. M2009-02607-CCA-R3-CD, 2011 WL 2682173, at *24 (Tenn. Crim. App. July 8, 2011) (citations omitted).

Appellant argues that "[t]he State spent virtually its entire case attempting to prove that [he] abused the child and that the abuse caused the death of the child" but that "the only potential evidence of neglect in the record, over and above the alleged abuse, was the delay in time from when [he] was first aware of the injuries to the child[] until he sought assistance by calling 9-1-1." He also posits that the State did not present any proof as to the effect of his failure to seek timely medical assistance. In support of this position, appellant cites to several cases in which this court has held that the evidence underlying the convictions for child neglect was insufficient. *See, e.g., State v. Jeffrey Scott Gold*, No. E2012-00387-CCA-R3-CD, 2013 WL 4278760 (Tenn. Crim. App. Aug. 15, 2013); *State v. Marcus Acosto Raymondo*, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207 (Tenn. Crim. App. Nov. 10, 2010); *State v. Denise Wiggins*, No. W2006-01516-CCA-R3-CD, 2007 WL 3254716 (Nov. 2, 2007). Notably, in those cases, *no* evidence was presented that the victims' conditions worsened due to the passage of time. In stark contrast, however, the victim's condition in the instant case deteriorated to the point of his death. Appellant's cases lend no support to his position.

This court has held that a defendant's failure to seek timely medical assistance for a victim's injuries could support convictions for aggravated child neglect and felony murder by aggravated child neglect. *Dorantes*, 331 S.W.3d at 384. However, we are unaware of any legal authority in Tennessee that requires *expert* testimony regarding the deleterious effect of failure to secure prompt medical attention for a victim. To the contrary, during oral argument on this case, this court instructed both counsel to prepare a supplemental brief to this court addressing this specific issue. The State complied and directed this court to *State v. Hodges*, 7 S.W.3d 609 (Tenn. 1998), which we find instructive.

In *Hodges*, the defendant was keenly aware that the victim had been abused under his watch. *Id.* at 614. In reviewing the evidence, this court concluded that it was "decisively apparent that either the mother . . . or the step-father, Defendant, inflicted the fatal injuries and that the victim was in the sole custody of Defendant throughout the day of her death." *Id.* Even if the defendant did not deal the fatal blows, he was nonetheless "distressed" about the victim's condition throughout the day, so much so that he attempted to discern a heartbeat and feel a pulse. *Id.* at 623. Based on his actions, this court surmised that the "Defendant knew this child was in serious medical trouble," yet he took no action to secure medical intervention for the child. *Id.* Upon this evidence, this court found "the evidence sufficient to permit the jury to convict him of first degree felony murder based upon a theory that Defendant knowingly neglected [the victim] so as to adversely affect her health and welfare." *Id.*

Turning to the facts of this case, appellant recorded a video of the victim at 12:17 p.m. on the date of his death. Dr. Seyler opined that the victim suffered from ataxia at that point, which is one's inability to coordinate his movements. He characterized the victim as "confused" and "disoriented" and said that he could not keep his balance. Based on his finding, Dr. Seyler stated that he would have ordered a CT scan for the victim if he had presented to the emergency room in that condition and that ataxia is often caused by injury to the brain. Dr. McMaster relayed that the victim would have "become symptomatic within a very short period of time" after suffering the brain injuries. She also confirmed Dr. Seyler's observation when she testified that she found evidence of brain injury during her autopsy of the victim.

The evidence further reflects that appellant, rather than summoning help immediately, played video games while lying on the bed next to the victim for over two hours. Despite being instructed to administer a breathing treatment to the victim, he declined to do so. Rather, he engaged in video games and text messaging his friends about his boredom in having to keep watch over the victim. The evidence was sufficient for the jury to conclude that appellant's delay in seeking emergency medical treatment for the victim had an adverse and deleterious effect on his health and, indeed, led to his untimely death, in support of his

-33-

convictions for both aggravated child neglect and felony murder during the perpetration of aggravated child neglect. Appellant is without relief on this claim.

### 3. Reckless Homicide

Appellant was convicted of reckless homicide as a lesser-included offense of felony murder during the perpetration of aggravated child abuse. Tennessee Code Annotated section 39-13-215(a) defines reckless homicide as the "reckless killing of another." The criminal statutes further instruct that

> "[r]eckless" refers to a person who acts recklessly with respect to . . . the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id.* § 39-11-302(c).

The evidence presented by the State established that appellant was aware of but consciously disregarded a substantial and unjustifiable risk of harm to the victim. At 12:17 p.m., he was concerned enough about the victim's condition that he recorded a video to send to R.K. so she could see his behavior. At 1:02 p.m., he sent R.K. a text informing her that the victim was grinding his teeth so badly that his mouth was beginning to bleed. Appellant's own testimony established that he believed the victim's condition was worsening. At 1:46 p.m., he wrote that the victim was "just dead to the world." Yet, he continued playing video games and texting his friends. He even called his sister shortly after 2:00 p.m. to ask her to bring him something to eat. A jury could have found that appellant was aware of a substantial risk of harm or death to the victim but consciously disregarded it. He is not entitled to relief on this claim.

### 4. Aggravated Child Abuse

As indicted in this case, the State's evidence underlying the conviction for aggravated child abuse must have established that appellant "unlawfully, knowingly, and other than by accidental means did treat [the victim] a child less than eight (8) years of age, so as to inflict injury on said child, with the said act of abuse resulting in serious bodily injury to the said child." Tenn. Code Ann. § 39-15-402(a)(1).

Appellant correctly notes that the State presented no direct evidence of any act of abuse by appellant toward the victim. However, the State presented ample circumstantial evidence that the victim had only a minor scratch on his nose when R.K. left him in appellant's care; that he had several bruises, abrasions, and a black eye when he presented at the emergency room; and that the autopsy established he suffered from brain injuries and internal bleeding in his abdominal region. The uncontroverted evidence was that appellant was the only person who was with the victim throughout the day. Although appellant offered his own expert witness to contradict the State's medical evidence, the differing opinions presented a jury question, which was resolved in favor of the State. Based on the circumstantial and direct evidence in this case, we cannot say that no reasonable trier of fact could have found the essential elements of aggravated child abuse beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Dorantes*, 331 S.W.3d at 379. Appellant is not entitled to relief from this conviction.

### B. Motion to Suppress Information Contained in Cellular Telephone

Appellant argues that the trial court improperly denied his motion to suppress all information contained in his cellular telephone. When officers initially questioned appellant, he voluntarily produced his telephone for the purpose of allowing officers to view a video of the victim that he recorded. After viewing the video, officers refused to return the telephone to appellant and instead seized it as evidence. This, appellant argues, exceeded the scope of his consent and violated his constitutional protection against warrantless searches and seizures.

When reviewing a trial court's ruling on a motion to suppress, this court will uphold the trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise. *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008) (citing *State v. Williams*, 185 S.W.3d 311, 314 (Tenn. 2006)). On appeal, "[t]he prevailing party in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.* (citing *Williams*, 185 S.W.3d at 314-15; *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). However, the trial court's application of the law to the facts is a question of law that we review *de novo*. *Id.* (citing *Williams*, 185 S.W.3d at 315; *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)).

It is axiomatic that "[b]oth the state and federal constitutions protect against unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression." *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). "Exceptions to the warrant requirement include searches incident to arrest, plain view, exigent circumstances, and others, such as the consent

to search." *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010). We begin our analysis with the proposition that the officers' initial "intrusion" of appellant's cellular telephone was by his consent. Appellant, having been properly advised of his *Miranda* rights, voluntarily provided officers with his telephone so that they could view the recording of the victim.

It is the officers' next action that appellant challenges. Having viewed the video, officers determined that it was incriminating in nature for several reasons. First, the victim did not have any marks or injuries on his face, although appellant had stated that the victim fell and scraped his chin when they were outside *prior to* the recording. Second, officers believed that the victim showed signs of being in distress at 12:18 p.m., but appellant did not call 9-1-1 until after 2:30 p.m. Accordingly, the officers seized appellant's telephone as evidence. The actual search of the contents of appellant's telephone was conducted at a later time pursuant to a search warrant, the validity of which appellant does not contest.[4]

The officers were given permission to view the video recording that appellant made. Upon viewing the video, evidence of an incriminating nature was in plain view of the officers. This court has stated that the plain view exception applies when: (1) the objects seized were in plain view; (2) the viewer had a right to be in position to view the seized object; and (3) the incriminating nature of the object was immediately apparent. *State v. Cothran*, 115 S.W.3d 513, 524-25 (Tenn. Crim. App. 2003) (citing *State v. Hawkins*, 969 S.W.2d 936, 938 (Tenn. Crim. App. 1997)). Appellant does not contest the fact that the officers had a right to be in position to view the video recording, nor does he argue that the evidence was not in plain view. Rather, his argument rests on the proposition that due to the "poor quality of the video of the victim, there was nothing about it that would immediately be recognized as 'incriminating' and justify its warrantless seizure."

The trial court did not make explicit findings of fact in its order denying appellant's motion. However, following the testimony, counsel and the trial court engaged in a discussion of the plain view exception to the warrant requirement. Based on the testimony and the discussion that ensued, it is clear that the trial court credited the testimony of the officers and applied the plain view exception. Because of the incriminating nature of the video, the evidence does not preponderate against the trial court's ruling on the motion to suppress.

---

[4] We are aware of the United States Supreme Court's decision requiring a search warrant before officers may search the contents of a cellular telephone. *See Riley v. California*, ___ U.S. ___, 134 S. Ct. 2473 (2014). However, this case does not run afoul of the *Riley* decision because appellant consented to the search of his telephone.

Moreover, having determined that the plain view doctrine applied to the video recording, we conclude that the officers, who were lawfully positioned to observe appellant's telephone pursuant to the consent given to them, were lawfully permitted not only to observe the video but to actually seize the telephone without offending the constitution. *See State v. Kenneth Wendland*, No. M2009-01150-CCA-R3-CD, 2011 WL 345846, at *5 (Tenn. Crim. App. Jan. 31, 2011) (citing Thomas K. Clancy, The Fourth Amendment: Its History and Interpretation 305 (Carolina Academic Press 2008) ("[P]lain view doctrine differs from mere visual inspection from a lawful vantage point in that the officer is also in a lawful position to *seize* the object without an additional intrusion.") (emphasis in original)). The warrantless seizure of the telephone did not invalidate the subsequent search warrant. *See id*. Appellant is not entitled to relief on this issue.

## C. Introduction of Photographs from Hospital and Autopsy

Appellant contests the admissibility of several photographs that were received into evidence at trial. Exhibits 8 through 11[5] are photographs that were taken at the hospital. Exhibits 48 through 61 and 87 are autopsy photographs taken by Dr. McMaster. Specifically, he challenges the admissibility of the Exhibits 48 through 61, which depicted the multiple contusions and abrasions on the victim's naked body and face, and Exhibit 87, which was an internal autopsy photograph of the victim's head showing the brain covered with blood.

Tennessee Rules of Evidence 401, 402, and 403 govern the admissibility of the photographs in this case. *See State v. Banks*, 564 S.W.2d 947, 949-51 (Tenn. 1978). First, a witness with knowledge of the facts must verify and authenticate a photograph before it can be admitted into evidence. *Id.* at 949; Tenn. R. Evid. 901. Next, a trial court must determine whether the photograph is relevant. *Id.*; *see* Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. If the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," it is relevant. Tenn. R. Evid. 401. Once it determines that a photograph is relevant, the trial court must then determine whether the probative value of the photograph is substantially outweighed by the danger of unfair

---

[5] Although appellant states that the trial court erred in admitting exhibits 8 through 11, he does not address the nature of the photographs or his specific objection to their admission. Moreover, he later argues that "[a]t a minimum, the [c]ourt should have limited the State to the hospital photographs and not allowed the external autopsy photographs." We conclude that appellant has waived his challenge to exhibits 8 through 11 because his brief does not "set[ ] forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief . . ." as is required by Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure. *See* Tenn. Ct. Crim. App. R.10(b); *see also State v. Sanders*, 842 S.W.2d 257 (Tenn. Crim. App. 1992) (applying waiver where defendant cited no authority to support his complaint).

prejudice. *See* Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Adv. Comm. Note). Furthermore,

> A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions.

*State v. Leach*, 148 S.W.3d 42, app. 63 (Tenn. 2004) (citing *Banks*, 564 S.W.2d at 951).

The decision whether to admit the photographs rests within the trial court's sound discretion, and we will not reverse the trial court's determination absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997); *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993). Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *See Banks*, 564 S.W.2d at 949.

"Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and probative value is not [substantially] outweighed by their prejudicial effect." *State v. Brock*, 327 S.W.3d 645, 694 (Tenn. Crim. App. 2009) (citing *Banks*, 564 S.W.2d at 949-51). Autopsy photographs must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case. *Banks*, 564 S.W.2d at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). However, "'if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant.'" *Brock*, 327 S.W.3d at 694 (quoting *Banks*, 564 S.W.2d at 951). "Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *State v. Derek Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011) (citing *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)).

Notwithstanding the extremely upsetting nature of photographs of a deceased child, the State had the burden of proving appellant's guilt of aggravated child abuse, aggravated child neglect, and felony murder during the perpetration of both of those underlying offenses

beyond a reasonable doubt. Appellant mounted a defense that portrayed the victim as a clumsy "crash kid" who was merely accident-prone and focused on the alleged accidental nature of the myriad injuries the victim suffered, including injuries due to CPR. While Dr. Seyler and Dr. McMaster could have attempted to explain the extent of the victim's injuries, the photographs provided valuable evidence by which the jury could assess the plausibility of appellant's explanations in light of the virtually uninjured condition in which R.K. left the victim with appellant on the day of his death. Moreover, we note that while Exhibits 48-67 are autopsy photographs, the victim had been cleaned of excess blood; his body was not depicted in a distorted manner; and the autopsy table itself was not easily seen in the photographs. The trial court did not err in admitting these photographs.

Exhibit 87, however, is a photograph of the victim's skull and brain taken during the internal autopsy. The trial court originally ruled that this photograph was inadmissible; however, during Dr. Young's testimony, he characterized the pooling of blood on the victim's brain as "oozing." This testimony opened the door for the State to request that the trial court reconsider its previous ruling and permit Dr. McMaster to refer to the exhibit during rebuttal.

Prior to Dr. McMaster's rebuttal testimony, the trial court conducted a hearing outside the presence of the jury and ruled that with regard to Exhibit 87, "the appearance of the blood creates a very high probative value in that one picture[] [and] that the probative value of the photo of the brain . . . is not substantially outweighed by the prejudicial effect." This was the only internal autopsy photograph that was introduced into evidence, and it was a close-up of the victim's brain. Neither his face nor any other distinguishing features were visible in the picture. We conclude that the trial court did not abuse its discretion in admitting this photograph.

### D. Dr. Seyler's Testimony Regarding Appearance of Injuries

Appellant complains that the trial court erred by permitting Dr. Seyler to testify, over objection, that one of the victim's injuries resembled finger marks and that one of the injuries looked like a shoe print. He characterizes the testimony as being outside of the scope of Dr. Seyler's expertise and lacking the required reasonable degree of medical certainty.

We begin our analysis with the proposition that admissibility of expert testimony is governed by the Tennessee Rules of Evidence:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a

witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. Our supreme court has further defined the role of the trial court in assessing the propriety of expert testimony:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

*State v. Scott*, 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations and quotation marks omitted).

The trial court is vested with broad discretion in resolving questions regarding the admissibility of expert testimony. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). On appellate review, we will not disturb a trial court's decision regarding the admission or exclusion of expert testimony absent an abuse of discretion. *Scott*, 275 S.W.3d at 404; *see Stevens*, 78 S.W.3d at 832. A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)). At trial, the burden rests on the party proffering the expert witness to establish that the evidence "rests upon 'good grounds.'" *Scott*, 275 S.W.3d at 404.

In a similar case, an emergency room nurse, who notably was *not* offered or accepted as an expert witness, testified that a wound looked like a cigarette burn. *State v. Brown*, 836 S.W.2d 530, 550 (Tenn. 1992). Addressing the propriety of the nurse's testimony, our supreme court has stated:

> Generally, non-expert witnesses must confine their testimony to a narration of the facts based on first-hand knowledge and avoid stating mere personal opinions or their conclusions or opinions regarding the facts about which they have testified. This rule preserves the province of the jury as the fact-finding body designated to draw such conclusions as the facts warrant.

An exception to this general rule exists where testimony in an opinion form describes the witness's observations in the only way in which they can be clearly described, such as testimony that a footprint in snow looked like someone had slipped or that a substance appeared to be blood. We conclude that the nurse's testimony that the injury on the victim's foot looked like a cigarette burn arguably falls into this exception. It follows that witness['s] . . . testimony was properly admitted.

*Id*. We find the *Brown* case instructive on this issue. If a nurse, who was not admitted as an expert witness, could properly testify that a wound looked like a cigarette burn, Dr. Seyler, who was accepted by the trial court as an expert in pediatrics, could properly testify that injuries looked like fingerprints and a shoe print. Because a lay witness could have offered the same opinions without error, we conclude that the doctor's opinions need not have been rendered to a reasonable degree of medical certainty.

Nonetheless, indulging appellant's argument, we note that in trials of both criminal and civil nature, medical doctors have historically been asked to render an opinion as to causation of an illness or injury to "a reasonable degree of medical certainty." *State v. James Clayton Young, Jr.*, No. 01C01-9605-CC-00208, 1998 WL 258466, at *22 (Tenn. Crim. App. May 22, 1998). This court has concluded, however, that the required degree of proof "is more properly stated as requiring proof 'that it is more likely than not' that the actions caused the results." *Id.* (quoting *Lindsey v. Miami Development Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985)). Although in criminal cases, experts have often testified to the cause of injuries or other conditions "to a reasonable degree of medical certainty," Tennessee law requires neither these nor "any other specific words be recited" as a condition precedent for admissibility of an expert opinion. *Id.* The only caveat is that a medical opinion must meet the degree of medical certainty enunciated in *Lindsey*. *See State v. Coker*, 746 S.W.2d 167, 174 (Tenn. 1987).

Dr. Seyler's testimony testified to what the injuries looked like, but he could not and did not render an opinion about the *mechanism*, or cause, of the injury. His opinion with regard to the fingerprints on the victim's neck was definitive; he stated that the marks were "almost pathognomic of child abuse," meaning that one could make the diagnosis of child abuse based on those marks alone. His opinions satisfied the degree of certainty necessary for admissibility.

We must note that any error in admission of Dr. Seyler's testimony in this regard is harmless. Appellant's own testimony provided an alternate explanation for the bruises on the victim's neck: appellant's fingers must have clutched the victim's neck when he

experienced the seizure. The jury, as was its prerogative, credited the State's evidence over the victim's self-serving excuse. Appellant is not entitled to relief on this claim of error.

### E. Dr. Seyler's Diagnosis/Opinion of the Victim as Seen in the Video

Appellant argues that the trial court erred by allowing Dr. Seyler to view the video recording and render an opinion with regard to the victim's symptoms, thereby effectively diagnosing his condition. The relevant law pertaining to this issue is set forth above in Section D of this opinion.

Dr. Seyler testified that he often diagnosed a child's medical condition by observing him. His viewing the video recording of the victim is analogous to his observing the victim. A child's physical condition is a source of information upon which pediatricians rely in diagnosing a medical condition. Dr. Seyler testified with certainty that the victim displayed ataxia. He conceded that the victim may have been having an asthma attack but said that he did not see or hear evidence of that. Although the sound quality of the video was poor, Dr. Seyler testified that he did not notice any of the visual signs of an asthma attack, such as a heaving chest and cyanosis. Moreover, any testimony in this regard was harmless, as Dr. Young also used the video recording in question to diagnose the victim as suffering from an asthma attack. Appellant is not entitled to relief on this claim.

### F. Detective Stone's Testimony Regarding Bruises on the Victim's Neck

Citing nothing more than Tennessee Rule of Evidence 701, appellant claims that Detective Stone's testimony that bruises on the victim's neck appeared to be fingerprint marks did not fall into one of the exceptions of the evidentiary rule and that Detective Stone's testimony was "particularly prejudicial." The State counters that the testimony was proper and that if it was not, any error was harmless.

Rule 701 provides:

(a)     Generally. If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

(1)     rationally based on the perception of the witness and

(2)     helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701. At the time of trial, Detective Stone was a law enforcement officer with twenty-two years of experience. His opinion regarding the marks on the victim's neck was rationally based on his experience as a detective. Moreover, we conclude that his opinion was helpful to a determination of fact in issue – whether the injuries to the victim were accidental or intentional. This fact was interjected by appellant when he testified that he must have accidentally inflicted the bruises on the victim's neck when he experienced the seizure. Had Detective Stone's opinion been erroneously admitted during the State's case-in-chief, it would have been admissible as rebuttal to appellant's assertion. *See also Brown*, 836 S.W.2d at 550 (noting that testimony in an opinion form that describes a witness's observations in the only way in which they can be clearly described may be admissible). The testimony of Detective Stone was properly admitted into evidence.

### G. Amy Vickers' Testimony Regarding Statements Made by R.K.

Appellant contests the trial court's admission of statements made by the victim's mother, R.K., to the emergency room nurse, Amy Vickers. The statements included exclamations such as, "My baby, my baby. Why did you kill my baby?" and "Why did you hurt my baby?" R.K. also asked, "What happened to him? Where did all the bruises come from?"

We first note that appellant did not lodge an objection until after Ms. Vickers had relayed R.K.'s statements at the emergency room wherein she asked, "What did you do to my baby? Why did you hurt my baby?" and "You killed my baby. Why did you kill my baby." Appellant has waived his challenges to those statements. Ms. Vickers' subsequent testimony was substantially similar to these statements.

Next, we draw the distinction that many of R.K.'s "statements" to Ms. Vickers were actually questions. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c).[6] Generally, hearsay is not admissible at trial unless it falls

---

[6] We are aware of the disagreement among panels of this court and also with our supreme court regarding the appropriate standard of review of the admissibility of hearsay evidence. *See State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (in considering an issue involving hearsay, holding that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record"); *Pylant v. State*, 263 S.W.3d 864, 871 n.26 (Tenn. 2008) (maintaining that the standard of review for hearsay issues is abuse of discretion); *Willie Perry, Jr. v. State*, No. W2011-01818-CCA-R3-PC, 2012 WL 2849510, at *3 (Tenn. Crim. App. July 11, 2012) (stating that standard of review for admissibility of evidence is abuse of discretion). *But see State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (stating that whether a statement is offered to prove
(continued...)

within an exception to the exclusionary rule. Tenn. R. Evid. 802. "[Q]uestions are often not hearsay because they are not offered to prove the truth of their content." *State v. Flood*, 219 S.W.3d 307, 314 n.5 (Tenn. 2007); *see* Neil P. Cohen et al., Tennessee Law of Evidence, § 8.01[10] (5th ed. 2005); *see, e.g.*, *United States v. Jackson*, 88 F.3d 845, 848 (10th Cir. 1996) (holding that the question, "Is this Kenny?" was non-hearsay because it could not "reasonably be construed to be an intended assertion"). Accordingly, to the degree that many of R.K.'s exclamations at the hospital were questions, they were not prohibited by the hearsay exclusion.

However, "[o]n rare occasions a question may be hearsay because it is used to prove an implicit assertion. An example is, 'Why did you wreck my boat?'" Cohen, § 8.01[10] n.52. Arguably, R.K.'s asking appellant why he killed her baby and what had he done to her baby could be an "implicit assertion." If, indeed, R.K.'s statements/ questions were "implicit assertions," they must fall within an exception to the hearsay rule.

The trial court applied Tennessee Rule of Evidence 803(2), the "excited utterance" exception, which embodies "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." "Underlying the excited utterance exception is the theory that 'circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.'" *State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (quoting *State v. Land*, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000)). Our supreme court has described the "ultimate test" of whether a statement meets the excited-utterance standard as "'spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.'" *Id.* (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)).

Our courts have interpreted Tennessee Rule of Evidence 803(2) as setting forth three requirements for a statement to meet this exception:

---

[6](...continued)
the truth of the matter asserted is "necessarily a question of law" and is not subject to review under abuse of discretion standard); *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007) (holding that appellate review of hearsay issues is de novo with no presumption of correctness); *Willie Perry, Jr.*, 2012 WL 2849510, at *7 (Bivins, J., concurring) (applying de novo standard of review to hearsay issues). It is not necessary for us to compare the merits of each position because, for purposes of our determination of this issue, the evidence is admissible under either standard of review.

The first requirement is "a startling event or condition" that "'suspend[s] the normal, reflective thought processes of the declarant.'" Second, the statement must "relate to" the startling event or condition. This broad requirement offers "considerable leeway" such that "the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." The third and final requirement dictates that the declarant make the statement while "under the stress or excitement from the event or condition." This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*Id.*

We conclude that R.K. certainly endured a startling event or condition when she was informed of the death of her son. Her statements to Ms. Vickers related to the startling event or condition. The short interval of time between R.K.'s learning of her son's death and her statements, together with the overwhelming nature of the situation, supports the conclusion that the statements were made while R.K. was still under stress from the event. The trial court properly applied this hearsay exception. Appellant is not entitled to relief on this claim.

## H. Sentencing Issues

With regard to sentencing, appellant raises several issues with regard to sentencing, which we address in turn.

### 1. General Principles of Sentencing

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn.

Code Ann. § 40-35-114, -210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id*. § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995) (citation omitted). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

## 2. Misapplication of Enhancement Factors

Appellant contends that the trial court erred by improperly applying two enhancement factors when imposing twenty-year sentences for aggravated child abuse and aggravated child neglect — the victim of the offense was particularly vulnerable because of age or physical or mental disability and the personal injuries inflicted upon, or the amount of the damage to property, sustained by or taken from the victim was particularly great. *See* Tenn. Code Ann. § 40-35-114(4), (6). The State concedes that the trial court improperly applied the enhancement factor that the personal injuries inflicted upon, or the amount of the damage

to property, sustained by or taken from the victim was particularly great because that factor was inherent in the offenses. *See id.* § 40-35-114(6). However, the State argues that the trial court properly applied the enhancement factor that the victim was particularly vulnerable because of age or physical or mental disability, *see id.* § 40-35-114(6), and that, therefore, the trial court did not abuse its discretion in sentencing appellant.

We agree with appellant and the State that the trial court improperly applied the enhancement factor that the personal injuries inflicted upon, or the amount of the damage to property, sustained by or taken from the victim was particularly great because serious bodily injury was an element of the offenses for which appellant was convicted. *See id.* § 39-15-402(a)(1) ("A person commits the offense of aggravated child abuse [or] aggravated child neglect . . . , who commits child abuse . . . [or] child neglect . . . and [t]he act of abuse [or] neglect . . . results in serious bodily injury to the child."); *id.* § 40-35-114 ("If appropriate for the offense and if not already an essential element of the offense, the court shall consider, but is not bound by, the following advisory factors in determining whether to enhance a defendant's sentence"); *State v. Poole*, 945 S.W.2d 93, 98 (Tenn. 1997); *State v. Jones*, 883 S.W.2d 597, 601 (Tenn. 1994) (quoting Tenn. Code Ann. § 40-35-114) (stating that enhancement factors may not themselves be essential elements of the offense).

However, appellant is also challenging the trial court's application of Tennessee Code Annotated 40-35-114(4), which states that a trial court may enhance a defendant's sentence when the "victim of the offense was particularly vulnerable because of age or physical or mental disability." Whether a victim is "particularly vulnerable" for purposes of this factor is "a factual issue to be resolved by the trier of fact on a case by case basis." *State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001); *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997). While it is true that the victim's age was the circumstance that enabled the State to indict appellant for Class A felonies rather than Class B felonies, our supreme court has stated, "We are of the opinion that the vulnerability enhancement relates more to the natural physical and mental limitations of the victim than merely to the victim's age." *State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993); *see* Tenn. Code Ann. § 39-15-402(b) ("A violation of this section is a Class B felony; provided, however, that if the abused, neglected or endangered child is eight (8) years of age or less, or is vulnerable because the victim is mentally defective, mentally incapacitated or suffers from a physical disability, the penalty is a Class A felony."). Use of this enhancement factor is appropriate when the victim's vulnerabilities "had some bearing on, or some logical connection to, 'an inability to resist the crime, summon help, or testify at a later date.'" *State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001) (quoting *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997)).

Upon our review of the sentencing order, we must conclude that the trial court erred in applying this enhancement factor as well. The trial court made no findings with regard to

the application of this factor as required under the law. *See Anthony Dewayne Hood*, No. E2008-02298-CCA-R3-CD, 2010 WL 3529002, at *21 (Tenn. Crim. App. Sept. 10, 2010) ("The trial court erred when it applied factor (4) because it made no factual findings that the victim was particularly vulnerable"); *State v. Osborne*, 251 S.W.3d 1, 27 (Tenn. Crim. App. 2007) ("In determining whether the State has met its burden, the trial court must consider a number of factors and must make factual findings."). "The State is required to proffer evidence in addition to the victim's age to establish particular vulnerability; however, that evidence 'need not be extensive.'" *Lewis*, 44 S.W.3d at 505 (quoting *Poole*, 945 S.W.2d at 97). In addition, a trial court "may consider the natural vulnerabilities attendant to the extreme ends of the aging spectrum by giving 'additional weight . . . to the age of the victim in those cases where a victim is extremely young or old.'" *Id.* (quoting *Poole*, 945 S.W.2d at 97). Because the trial court in this case failed to make the requisite findings, we cannot conduct a proper appellate review of the additional factors it considered or its reasons, if any, for giving additional weight to the age of the victim.

Our conclusions with regard to the two enhancement factors do not necessarily affect the length of appellant's sentences, however. Under *Bise*, misapplication of an enhancing or mitigating factor in passing sentence will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. The trial court imposed two twenty- year sentences for aggravated child abuse and aggravated child neglect. The sentencing range for these Class A felonies as a Range I, standard offender was fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). The trial court fixed appellant's sentence in the middle of the applicable range. The record reflects that the trial court considered the requisite factors in passing sentence, including the evidence received at the trial and the sentencing hearing, the presentence report, the principles of sentencing, the nature and characteristics of the criminal conduct involved, evidence pertaining to mitigating and enhancement factors, statistical information provided by the administrative office of the courts, appellant's own statements, and the potential for rehabilitation. *Id.* §§ 40-35-103(5), -113, -114, -210(b). Pursuant to *Bise*, this court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." 380 S.W.3d at 709-10. Appellant bore the burden of establishing that his sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). He has failed to carry his burden, and we will not disturb the trial court's sentencing decision.

### 3. Failure to Apply Mitigating Factors

The trial court applied one mitigating factor: that appellant, although guilty of the crime, committed the offense(s) under such unusual circumstances that it is unlikely that a

sustained intent to violate the law motivated the criminal conduct. Tenn. Code Ann. § 40-35-113(11). Appellant contends that the trial court erred in failing to apply the following mitigating circumstances: (1) appellant, because of youth or age lacked substantial judgment in committing the offense; (2) appellant had no prior history of violent behavior or criminal behavior; (3) appellant's medical history and current condition; and (4) appellant's background, family history, family relationships and support. *See* Tenn. Code Ann. § 40-35-113(6), (13).

First, with regard to Tennessee Code Annotated section 40-35-113(6) and (13), we decline to find that the trial court erred by failing to consider appellant's youth or lack of judgment. Testimony from appellant's sisters, Courtney Gore and Clarissa Greenwood, and his brother-in-law, Justin Gore, was offered to demonstrate that appellant was good with children. Mrs. Gore asserted that appellant helped raise her daughter, appellant's niece, for nine months while he lived with Mrs. Gore and her husband and that Mrs. Gore never had any reason to worry about appellant's care of her daughter. Clarissa Greenwood, appellant's sister and Mrs. Gore's twin sister, testified that appellant had helped care for her son and that she never worried about appellant being violent toward either of her two children. Justin Gore, appellant's brother-in-law, stated that while he was gone on active duty with the Navy, appellant helped care for his daughter. Mr. Gore asserted that he did not worry about leaving appellant at his home with his family. Even appellant's ex-girlfriend, Samantha Smith, testified that appellant had interacted well with children in both her family and his own and that she had never witnessed an incident of violent behavior from appellant. We conclude that appellant cannot rely on his youth and poor judgment in caring for the victim while simultaneously professing to the court that he is good with children and responsible. The trial court did not err in this regard.

We discern appellant's medical history and his current medical condition to be unavailing to his position. There is no indication that appellant cannot be adequately treated for his seizure disorder while incarcerated. Other than appellant's self-serving testimony, there is no evidence that his medical condition had any bearing on his commission of the offenses in this case. Even if one were to accept that his alleged seizure and subsequent fall contributed to the victim's condition in this case, the fact still remains that appellant failed to seek medical care for him in a timely fashion. We find no error in the trial court's ruling in this regard.

While appellant's family relationships and his lack of criminal history or prior violent behavior may have been properly considered as mitigation under the "catch-all" provision, we adhere to the standard announced in *Bise* and reaffirm the proposition that if a trial court complies with the requisite sentencing purposes and principles but nonetheless misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the

presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. The trial court's sentencing decision was "within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Appellant has failed to carry his burden of demonstrating that the sentences are erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *Ashby*, 823 S.W.2d at 169. He is not entitled to relief from his two twenty-year sentences.

### 4. Failure to Sentence Appellant as an Especially Mitigated Offender

Appellant argues that the trial court erred by not sentencing him as an especially mitigated offender. Having determined that the trial court erred by applying both enhancement factors, appellant is eligible for treatment as an especially mitigated offender because the trial court found a mitigating factor to be applicable.

Tennessee Code Annotated section 40-35-109 permits a trial court to classify a defendant as an especially mitigated offender if: "(1) The defendant has no prior felony convictions; and (2) The court finds mitigating, but no enhancement factors." Such classification could result in a ten percent reduction in a defendant's sentence, a reduction of the release eligibility date by twenty percent, or both. *Id.* at § 40-35-109(b). A trial court's conclusion with regard to especially mitigated offender status is appealable by either party. *Id.* at § 40-35-109(d). Even if a defendant is eligible for especially mitigated offender status, sentencing the defendant as an especially mitigated offender is discretionary with the trial court, not mandatory. *State v. Stephen Anthony Scott*, No. M2012-01416-CCA-R3-CO, 2013 WL 5675472, at *4 (Tenn. Crim. App. Oct. 17, 2013), *perm. app. denied* (Tenn. March 3, 2014); *see* Tenn. Code Ann. § 40-35-109(a) (stating that a court "may find the defendant is an especially mitigated offender"). Rather, "especially mitigated status is reserved for 'instances where the trial judge may desire to depart from even the minimum sentence for a Range I offender and impose lesser penalties.'" *Id.* (quoting Tenn. Code Ann. § 40-35-109, Sentencing Comm'n Cmts).

The trial court did not err in declining to sentence appellant as an especially mitigated offender. We have found no authority that mandates this classification; to the contrary, this decision is discretionary with the trial court. *See State v. Braden*, 867 S.W.2d 750, 763 (Tenn. Crim. App. 1993) (holding that the trial court did not abuse its discretion in refusing to sentence appellant as an especially mitigated offender given the serious nature of the offenses for which the appellant was convicted). Appellant is not entitled to relief.

**CONCLUSION**

Based on our review of the record, the parties' briefs, the applicable case law, and the arguments of counsel, we affirm the judgments of the trial court.

_____

ROGER A PAGE, JUDGE